NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-046

CURTIS TEZENO

VERSUS

DANIEL ROBERT YOUNG, ET AL.

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 76318-B
HONORABLE CHUCK R. WEST, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Shannon J. Gremillion, Candyce G. Perret, and Jonathan W. Perry, Judges.

Perry, J., concurs in part, dissents in part, and assigns reasons.

**AFFIRMED AS AMENDED.**

**Jerry J. Falgoust**
**Falgoust and Caviness, LLP**
**Post Office Box 1450**
**Opelousas, Louisiana 70571-1450**
**(337) 942-5812**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Daniel Robert Young**
    **City of Ville Platte**

**Marcus L. Fontenot**
**Fontenot & Ludeau, LLC**
**Post Office Box 69**
**Ville Platte, Louisiana 70586**
**(337) 363-2388**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Curtis Tezeno**

**GREMILLION, Judge.**

Defendants, Daniel Robert Young and the City of Ville Platte, appeal the trial court's judgment awarding Plaintiff, Curtis Tezeno (Tezeno), $225,000.00 in general damages and $241,395.10 in special damages after its determination that Tezeno sustained both an aggravation of a preexisting condition and a new injury as a result of a rear-end collision. For the following reasons, we affirm as amended.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 3, 2015, Tezeno's truck was rear-ended by a vehicle driven by Daniel Young (Young) when Young failed to see Tezeno's truck stopped at a stop sign at the intersection of Cotton Street and Court Street in Ville Platte, Louisiana. Young was traveling in a tractor with a front-end loader owned by his employer, the City of Ville Platte (the City).

Tezeno filed a petition for damages in July 2016 against Young and the City. The matter proceeded to a bench trial on September 26, 2018. The parties stipulated that Young, who was acting in the course and scope of his employment, was solely responsible for the accident. The extent of the damages Tezeno suffered from the accident was greatly contested because he had a preexisting back injury, accompanied by complaints of right leg pain.

The only live testimony heard at the bench trial was from Tezeno and Cody Savoie (Officer Savoie), the former Ville Platte police officer who responded to the accident. The remainder of the evidence consisted primarily of medical reports, medical bills, and depositions.

Tezeno submitted into the record the medical reports of his family doctor, Dr. Charles E. Fontenot (Dr. Fontenot); the medical reports and two depositions of his orthopedic surgeon and treating physician, Dr. Louis C. Blanda, Jr. (Dr. Blanda); the deposition of and Life Care Plan prepared by Dr. Shelly N. Savant (Dr. Savant), a

neurologist, psychiatrist, and certified life-care planner; and the contingent fee contract[1] executed by Tezeno. The defendants submitted into the record the deposition testimony of Dr. Joan C. Wojak (Dr. Wojak), a neurosurgeon and interventional neuroradiologist, and Dr. Neil C. Romero (Dr. Romero), an orthopedic surgeon.

The trial court took the matter under advisement and, on October 11, 2018, issued written Reasons for Judgment, ruling in favor of Tezeno. The trial court awarded Tezeno damages for past medical expenses in the amount of $32,834.42,[2] past and future pain, suffering, and loss of enjoyment of life in the amount of $225,000.00, and $208,560.68 for future medical care. The trial court further ordered the creation of a reversionary trust for Tezeno's future medical care award, in accordance with La.R.S. 13:5106(B)(3)(a).

On November 2, 2018, Tezeno filed a Rule to Show Cause based on the defendants' objection to the proposed judgment. Specifically, defendants objected to Tezeno's attorney fees being deducted from the future medical care award before establishment of the reversionary trust, i.e., prior to the medical care being administered.[3] After a hearing on November 16, 2018, the trial court overruled

---

[1] The contingent fee contract, dated August 3, 2015, provided Tezeno's attorney would receive: (1) thirty-three and one-third percent of the amount recovered in the event (a) settlement was achieved without the necessity of filing suit, (b) suit was filed, and (c) a trial actually started; or (2) forty percent of the amount recovered if an appeal was filed by any party.

[2] Defendants do not assign as error the trial court's award for past medical expenses.

[3] The disputed portion of the proposed Judgment stated:

> IT IS FURTHER ORDERED ADJUDGED AND DECREED that in accordance with La.R.S. 13:5106, the amount owed by the City of Ville Platte for future medical care shall, after deduction of attorney[] fees of $69,520.23, be deposited into a reversionary trust established for the benefit of the plaintiff and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument, and that said reversionary trust instrument provide that such medical care and related benefits be paid directly to the provider as they are incurred.

defendants' objection, ordering that the amount owed by defendants for Tezeno's future medical care shall, after deduction of attorney fees, be deposited into a reversionary trust.

On November 26, 2018, the trial court signed a Judgment in conformity with its written Reasons for Judgment of October 11, 2018, and its ruling of November 16, 2018.[4]  Defendants appeal and assign three errors:  (1) the trial court erred in awarding $225,000.00 in general damages; (2) the trial court erred in awarding $208,560.68 for future medical care; and (3) the trial court erred in ordering the defendants to deduct the total amount of attorney fees from the award for future medical care before deposit into the reversionary trust.

## ANALYSIS

*Causation*

In their first assignment of error, defendants claim the trial court's award of $225,000.00 in general damages was abusively high.  Although defendants' first assignment of error refers to quantum, the crux of this argument revolves around the

---

IT IS FURTHER ORDERED ADJUDGED AND DECREED that the amount of $69,520.23 shall be paid as attorney fees directly to counsel for Curtis Tezeno prior to placement of funds into the reversionary trust.

[4] Pertinent to attorney fees, the Judgment states:

IT IS FURTHER ORDERED ADJUDGED AND DECREED that in accordance with La.R.S. 13:5106, the amount owed by the CITY OF VILLE PLATTE for future medical care shall, after deduction of attorney[] fees, be deposited into a reversionary trust established for the benefit of the plaintiff and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument, and that said reversionary trust instrument provide that such medical care and related benefits be paid directly to the provider as they are incurred.

IT IS FURTHER ORDERED ADJUDGED AND DECREED that should this judgment not be appealed, the total amount of attorney fees to be deducted from the amount awarded for future medical damages before deposit into the reversionary trust shall be $69,520.23.  However, in the event this judgment is appealed, the total amount of attorney fees to be deducted from the amount awarded for future medical damages before deposit into the reversionary trust shall be $83,424.27.  The attorney fees shall be paid directly to counsel for Curtis Tezeno prior to placement of funds into the reversionary trust.

3

causal link between the accident and the resulting injuries, particularly the causal relationship between the accident and the sacral injury of which Tezeno complains.

Tezeno alleges the accident caused both a major aggravation of his preexisting back condition and a fracture in his sacrum. As a result, Tezeno asserts he is entitled to past and future general damages, extensive future medical care, and a housekeeper for the remainder of his life.

Defendants argue Tezeno did not prove the accident caused either a major aggravation of his preexisting back condition or a fractured sacrum. Defendants contend that the accident caused, at most, a minor aggravation of Tezeno's preexisting, chronic back condition. Defendants argue the trial court erred in awarding Tezeno excessive damages in light of the medical evidence and differing medical opinions concerning whether Tezeno had a sacral fracture. In brief, defendants state: "The many MRIs taken before and after the accident at issue in this case . . . show the plaintiff's condition did not change." Defendants further allege:

> The consistent complaints the plaintiff had before and after the accident at issue and the same treatment and recommendations provided by Dr. Blanda before and after the accident at issue do not evidence a back that has undergone serious trauma justifying a general damages award of nearly a quarter of a million dollars.

The record in this matter includes a vast amount of medical evidence. Mindful of the fact that only two live witnesses were presented at trial—Tezeno and Officer Savoie—the following is a complete account of the evidence before the trial court.[5] We begin with the relevant history pertaining to Tezeno's preexisting injury.

Prior to the accident at issue, Tezeno was involved in an automobile accident on November 18, 2011, and he injured his lower back, accompanied by right leg pain. Tezeno saw his family doctor, Dr. Fontenot, and an MRI was performed on

---

[5] The manifest error standard of review applies to all factual findings regardless of the form of the evidence before the trier of fact. *Darbonne v. Wal-Mart Stores, Inc.*, 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022; *Shephard v. Scheeler*, 96-1690 (La. 10/21/97), 701 So.2d 1308.

4

January 20, 2012. The impression of the radiologist, Dr. Gerard Ballanco, Jr. (Dr. Ballanco), was, "Mild disc bulging at L4-5. No spinal canal or nerve root impingement."

Tezeno began seeing Dr. Blanda, an orthopedic surgeon, as a patient on October 18, 2012, and another MRI was performed on November 13, 2012. The impression of the radiologist, Dr. Edward Willett (Dr. Willett), indicated: "Mild disc bulge L5-S1" and "Minimal bulge at L4-L5 is unchanged in January, 2012." Also, Dr. Willett's findings stated: "There is abnormal signal density identified in the S3 vertebral body which is T1 hypointense and T2 hyperintense, stable. This has not changed since the prior study and could represent an atypical angioma. A CT scan of the sacrum may be of additional value."

According to Dr. Blanda's records, Tezeno's appointment on May 26, 2015—his last before the accident at issue—was a "routine [follow-up for] his chronic lower back condition associated with the disc herniation L5-S1. He has primary axial pain associated with instability and does not have significant radicular symptoms at this point. He is managing nonsurgically. He continues on Norco, cyclobenzaprine and ibuprofen which offer symptomatic relief[.]" Tezeno's next appointment was scheduled for August 25, 2015.

On August 3, 2015, Tezeno was involved in the subject rear-end collision. The day after the accident at issue, Tezeno sought treatment from his family doctor, Dr. Fontenot. His examination showed that Tezeno had "right sided paravertebral muscle spasms" and "tenderness of the L4-L5 and L5-S1 interspaces." Dr. Fontenot gave Tezeno an injection of steroid, a liniment application, and prescribed physical therapy.

On August 25, 2015, Tezeno saw Dr. Blanda. Dr. Blanda's records indicate Tezeno reported "symptoms with his back have been significantly worsened" as a

result of his accident on August 3, 2015. Nonetheless, Dr. Blanda did not change his treatment of Tezeno. He continued to prescribe the same medications and scheduled a routine appointment in three months.

Tezeno continued to have follow-up care with Dr. Fontenot, who ordered a lumbar MRI. Tezeno had an MRI on October 7, 2015. The impressions of the radiologist, Dr. Ballanco, were: "1. No nerve root impingement seen within the lumbar spine. 2. T2 hyperintense lesion within the S3 segment which is likely nonaggressive as it is similar in appearance to comparison from November 13, 2012." Notably, the MRI did not identify the presence of an L5-S1 disc herniation, as was indicated on the MRI performed on November 13, 2012.

Tezeno returned to Dr. Blanda on November 24, 2015, with complaints of lower back pain and right leg pain, rating his pain on a scale of one to ten as seven, with one being the lowest. Dr. Blanda prescribed Tezeno a lumbar support brace and recommended an electromyography/nerve conduction velocity (EMG/NCV) test of the right leg.

The medical records of Dr. Daniel L. Hodges indicate Dr. Blanda referred Tezeno for "EMG/NCV studies of the right lower extremity to assess for occult radiculopathy." The EMG/NCV test performed on December 15, 2015, indicated an "essentially normal EMG/NCV of the right lower extremity. No clear cut [sic] findings to verify acute radiculopathy[.]"

Tezeno saw Dr. Blanda on January 5, 2016. Dr. Blanda's notes reflect Tezeno reported "pain in the lower right aspect of his back in the sacroiliac joint which then radiates into his posterior thigh to behind his knee." His notes further declare: "He does have a bulging disc at L5-S1. His EMG/NCV is normal." Notably, the MRI performed on October 7, 2015 showed no bulge present at L5-S1. Dr. Blanda recommended Tezeno have a right sacroiliac joint injection.

According to Dr. Blanda's records, Tezeno was seen on March 8, 2016, "for the first injury." Tezeno rated his pain as seven out of ten. Dr. Blanda's notes state Tezeno "has gotten worse with back pain since the new accident. Will close this account and begin seeing him for new injury since he was made worse."

On March 28, 2016, Dr. Blanda performed a right sacroiliac joint injection with the use of fluoroscopy. At his follow-up appointment on April 15, 2016, Tezeno complained of lower back pain and occasional right leg pain, and he reported he had no relief from the injection. Tezeno received refills of his medications and was encouraged to attend another course of physical therapy. Dr. Blanda's notes, however, indicate Tezeno would "think about it for now."

When Tezeno returned to Dr. Blanda on July 14, 2016, his pain rating remained a seven out of ten. However, Tezeno complained of pain in his left leg, not his right leg. Dr. Blanda ordered an updated MRI of Tezeno's lumbar spine.

An MRI from Stand-Up-Open MRI Centers of Louisiana (the Stand-Up MRI) was obtained on August 30, 2016. The radiologist, Dr. Lawrence W. Glorioso, III, indicated bulging of the L4-5 intervertebral disc toward the left side. Notably, the Stand-Up MRI showed no bulge present at L5-S1; however, Dr. Blanda's notes reflect: "The report reads bulging of the L4-5 disc eccentrically prominent to the left side. There also appears to be centralized disc bulge at L5-S1 that is not noted on the report."

Tezeno saw Dr. Blanda on September 6, 2016. He reported lower back pain, left leg pain, and again rated his pain as seven out of ten. Dr. Blanda referred him to Dr. Steven K. Staires (Dr. Staires), a pain management specialist, for lumbar epidural steroid injections (LESI).

On October 6, 2016, Dr. Staires administered to Tezeno fluoroscopically guided LESIs at L4, left, and L5, left. At his follow-up appointment with Dr. Blanda

7

on October 20, 2016, Tezeno complained of lower back pain, left leg pain, and rated his pain as ten out of ten. Tezeno also reported he had no relief from the injections. Dr. Blanda's notes indicate: "The patient is asking for possible surgical intervention due to the severity of his symptoms. I explained to [Tezeno] that the MRI results are somewhat equivocal so we will order a discogram of L4-L5 and L5-S1."

A lumbar discography was performed by Dr. Staires on November 29, 2016. The medical records of Dr. Staires indicate the discogram produced negative results at L3-L4, L4-L5, and L5-S1.

Tezeno returned to Dr. Blanda on December 6, 2016, with lower back pain, left leg pain, and a pain rating of seven to eight out of ten. The medical records of Dr. Blanda indicate that after the negative results of the discogram were reviewed, and the possibility of referring Tezeno to pain management was discussed. Tezeno declined, opting instead for refills of his prescription medications.

Tezeno was deposed by defendants on January 10, 2017. The first time he was asked to describe "the area of [his] back that [he] injured in this accident," Tezeno responded, "The lower right hand side." Defense counsel asked, "Do you have any issues with any other area of your body, other than your lower right hand side of your back?" Tezeno responded, "My leg. . . . Right leg. And my -- not right. Getting confused. Left. It was the left. . . . And my testicles." He said he had issues with his right leg before the accident but stated that since the accident his right leg "doesn't really bother me."

Tezeno rated his pain as three out of ten before the accident, and as eight to nine out of ten after the accident. The following testimony was elicited when defense counsel once again asked Tezeno about what injuries he suffered as a result of the accident:

Q. Before this accident, you said you injured your low back on the right side, with light [sic] leg pain?

A. Yes, sir.

Q. Okay. After this accident, you said you injured your lower right hand side of your back near the belt line?

A. Left hand side. This accident is the lower left hand side.

Q. So this accident, the area where you injured is your lower left hand side of your back?

A. Yes, sir.

Q. Okay. So when you told me that you injured your lower right hand side of your back near your belt line, that was incorrect?

A. That was --

Q. You had gotten confused?

A. -- the right hand side.

Q. The right hand side is not correct?

A. No, sir.

Q. For the 2015 accident --

A. It's the left hand side.

Q. The left hand side of your back, near the belt line, is what you injured in this accident?

A. Yes, sir.

Q. And it is your left leg?

A. Left leg.

Q. As opposed to your right leg?

A. Yes, sir.

Q. The 2011 accident, it was the right side of your back, and your right leg?

A. Yes, sir.

9

Q. And in this accident, 2015, it is the left side of your back, and your left leg?

A. Left leg right now.

Q. Okay. Due to this accident in 2015, did you have any injury to your right leg?

A. Not that I can recall.

Q. Any injury, increasing in pain in your right side of your back?

A. Not that I can recall.

Q. So basically, what you were having from the 2011 accident, basically has remained the same? Is that right?

A. Yes, the pain is still there.

Q. The pain is still there from the 2011? That's on the right side of your back and your right leg, that has remained basically the same after the 2015 accident; is that right.

A. Correct.

Q. But your injury that you are relating to this accident, is your left side of your back, along with the left leg?

A. Yes, sir.

Q. That is the only injury you had in this particular case?

A. Yes, sir.

Following his deposition, Tezeno saw Dr. Blanda on January 31, 2017, reporting lower back pain, left leg pain, and again rated his pain as seven to eight out of ten. Dr. Blanda recommended a lumbar support brace and continued prescribing medications.

Tezeno returned to Dr. Blanda on April 25, 2017. Although Tezeno rated his pain as seven out of ten, Dr. Blanda's record states: "The patient has increasing pain as well as radicular symptoms on the left. At this time I will request an updated MRI of his lumbar spine. The disc is probably worsened."

Tezeno saw Dr. Blanda on July 25, 2017, with complaints of lower back pain, left leg pain, and rated his pain as seven out of ten. Since Tezeno's MRI was not approved, Dr. Blanda continued prescribing medications.

The record indicates Tezeno had an MRI on September 26, 2017. Along with findings of discs bulging at L4-5 and L5-S1, the impression of the radiologist, Dr. Ballanco, indicated an "[a]bnormal signal within the S3 segment which could reflect a fracture or other osseous lesion[]" for which he advised obtaining a "[d]edicated MRI of the lumbar spine with and without contrast[.]" Notably, the report indicates there was no comparison of this MRI to any of Tezeno's previous MRIs.

At his first deposition in this matter on September 28, 2017, Dr. Blanda testified he began seeing Tezeno as a patient on October 18, 2012, for lower back and right leg pain related to an automobile accident on November 18, 2011. He ordered Tezeno's second MRI, the one performed on November 13, 2012, because he "thought [Tezeno] had some type of lesion in his sacrum." Dr. Blanda attributed Tezeno's lower back and right leg pain to the accident in November 2011, stating, "I thought he had a small disc bulge or a small herniation in -- in the low back." The last time Tezeno reported right leg pain to Dr. Blanda was on May 7, 2013.

From October 18, 2012, until the subject accident on August 3, 2015, Dr. Blanda saw Tezeno regularly for treatment of his back condition. Although Dr. Blanda's records indicate he considered Tezeno a surgical candidate, his primary treatment consisted of prescription medications.

During a routine appointment on August 25, 2015, Dr. Blanda learned Tezeno was involved in the subject accident. According to Dr. Blanda, Tezeno reported "his pain had worsened since [the accident], and he presented with increase of back pain, and he was asking about being treated for this injury, and my office pretty much told him that we'd have to set up a separate or different account record for a new injury."

11

Dr. Blanda did not alter his treatment and continued to issue Tezeno the same prescription medications.

Dr. Blanda testified Tezeno had a follow-up appointment on November 24, 2015. On this occasion, Tezeno reported lower back pain and a recurrence of right leg pain. Dr. Blanda testified he reviewed the MRI ordered by Dr. Fontenot and performed on October 7, 2015. Comparing the MRI performed on November 13, 2012, which showed a mild disc bulge at L5-S1, Tezeno's counsel asked Dr. Blanda if the MRI performed on October 7, 2015, "show[ed] the bulge at the L5-S1 level?" Dr. Blanda replied:

> [T]he MRI ordered by Dr. Fontenot did not -- at least on the report indicate any problems. It still showed that lesion in the sacrum, which had been previously diagnosed by the radiologist as an hemangioma, which is a collection of blood vessels.
>
> I -- let's see. I'm pretty sure I looked at that MRI and commented on it.
>
> Yeah, I said I reviewed the -- the MRI, and that the previous bulge at L5-S1 was not visible on this new MRI.

Q. Is that a common thing?

A. It happens sometimes. And sometimes it's just the technique, the way the scan's done, I might miss it. Sometimes the bulge itself shrinks and -- and that's where the body tries to heal itself.

Q. On the date of November 24th, was Mr. Tezeno's complaints consistent with lower -- lower back pain?

A. Yes.

Q. He also, it looks like, maybe had some right leg problems?

A. He had a recurrence of his leg pain again. He had some weakness in his right foot, and he had the numbness in his foot and calf again.

Dr. Blanda testified that until April 15, 2016, Tezeno continued to report pain in his lower back and right leg. However, on July 14, 2016, he reported pain in his left leg, not his right leg.

Under cross-examination, defense counsel probed the inconsistency between Dr. Blanda's testimony and Tezeno's deposition, where Tezeno claimed he only had left leg pain after the accident. The following exchange occurred after defense counsel asked Dr. Blanda, "[D]idn't you do some injections on the right side?"

A. I did a SI joint injection on his right side, yes.

Q. And so if -- so obviously, he was telling you his right side is hurting [him], his right leg and not his left leg?

A. Correct.

Q. So if, in fact, he tells me in his deposition that he had no right leg pain after the . . . August 3, 2015, accident, but only had left leg pain, that is inconsistent with the information he presented to you?

A. Yes.

Q. And you're basing your opinion as to what this accident may or may not have done to him, you're basing that on his -- his complaints and his credibility to relate to you correct responses?

A. Sure.

Q. Would you agree that what I'm telling is correct about what he said his complaints were and what he told you were inconsistent?

A. Well, I don't think, you know, in retrospect, that the left leg problems are likely related because that didn't present at least, in my records, till a year later.

Q. Okay. So the -- no. Wait. Would you repeat that? I might have missed --

A. I said I -- if it's -- what you're saying is correct, that the left leg didn't start hurting him for about a year afterwards, then it would probably not be related.

Q. To the -- this August 2015?

A. Right.

Q. And based on your records, that -- does that confirm, you don't have any reports of his left leg issue prior to July of 2016?

A. Correct.

In terms of his treatment after Tezeno complained of left leg pain, Dr. Blanda testified he ordered an updated MRI. On August 30, 2016, Tezeno had a Stand-Up MRI. Dr. Blanda explained why a Stand-Up MRI is different: "[T]he idea with a stand-up MRI is that the discs are stressed more with the body weight on -- on the discs, and if you have a -- a subtle injury that doesn't show without the discs being loaded, it might show up on the -- the body weight standing MRI." The Stand-Up MRI indicated bulging of the L4-5 intervertebral disc toward the left side, which Dr. Blanda stated "could account for [Tezeno's] left-sided symptoms."

Dr. Blanda reviewed the results of the Stand-Up MRI with Tezeno on September 6, 2016. He was specifically asked about his notation in his records from that visit: "There also appears to be centralized disc bulge at L5-S1 that is not noted on the report." Dr. Blanda explained, "Yeah. The radiologist didn't report it, but when I looked at it, I thought there was still some -- some bulging there." Thereafter, Dr. Blanda referred Tezeno to Dr. Staires for lumbar epidural steroid injections.

Dr. Blanda saw Tezeno again on October 20, 2016, after administration of epidural steroid injections by Dr. Staires to Tezeno at L4 and L5 on October 6, 2016. Dr. Blanda recommended a discogram because Tezeno reported he did not get any relief from the injections. In his deposition, Dr. Blanda explained that in a discogram, "the suspected discs are injected with dye, and there's also a control disc that's injected with dye[]" along with "an x-ray to see what . . . the dye does inside the disc, whether it leaks out or goes through a rupture or a tear of some type."

Dr. Blanda saw Tezeno on December 6, 2016, after a discogram was performed by Dr. Staires on November 29, 2016. Dr. Blanda testified the discogram did not produce any positive pain responses; therefore, he ruled out Tezeno's need for surgery for a ruptured disc. When Dr. Blanda was asked what his diagnosis was after Tezeno's discogram, he answered:

I was surprised, so . . . by ruling out the other things probably left us with a -- diagnosis of some type of soft-tissue injury, whether it's muscular or ligamentous.

And it -- it still -- I guess maybe that -- that lesion in the sacrum could be causing symptoms, but that is not a trauma thing. It's a developmental problem with a blood vessel, and it -- kind of like an aneurysm in the bone.

Dr. Blanda saw Tezeno on January 31, 2017, April 25, 2017, and July 25, 2017. He testified that Tezeno reported increased pain at his April 2017 visit; therefore, Dr. Blanda recommended an updated MRI.

Tezeno had an MRI on September 26, 2017, two days before Dr. Blanda gave his first deposition. Dr. Blanda testified he had reviewed a copy of the MRI report and, based on the radiologist's remark concerning a possible fracture in Tezeno's sacrum, it was Dr. Blanda's belief Tezeno needed an MRI with contrast. Tezeno's counsel asked, "And [the radiologist] said the 'abnormal signal could reflect a fracture'?" Dr. Blanda replied:

Well, he said "could reflect a fracture or -- or other osseous lesion," so it's -- it's kind of inconclusive.

Q. Okay. And a fracture could be trauma related?

A. It's possible. Don't know yet though.

When Dr. Blanda was cross-examined by defense counsel about that MRI, the following exchange ensued:

Q. First of all, on the new OGH Imaging that was done on September 26, 2017, when it talked about an abnormal signal within his first three segments --

A. Right.

Q. -- that is something that was preexisting this particular accident, right?

A. Yeah. That was present on the very early MRIs, as well.

Q. We're -- you're talking about the ones in 2012?

15

A.    Yes.

Q.    And that S3 is -- although it -- it has a suggestion that you might want to look for a fracture or some other lesion, that was something you -- you explained, is -- was -- I think you said, a lesion in the sacrum, and it was not trauma-related when you looked at it from the 2012, but just because the radiologist says, "You might want to look to see if there was some other reason, other than the -- the lesion in the sacrum, unrelated to trauma,["] you -- you suggest that he does that new MRI?

A.    Yes.

Q.    But there's nothing for you to indicate right now that this S3 is related to any type of trauma?

A.    Not that I can tell, no, sir.

Q.    And --

A.    I don't think it is.  It -- it was reported, and when I looked at it, it looked like [it's] what is called a "hemangioma," a collection of blood vessels in the bone.  And sometimes it can expand and grow, and it -- certainly, if -- if the patient falls on his pelvis or something of that nature, it could traumatize him, but I'm just not sure.  I don't think he had any falls or anything.  It was just a twist --

Q.    He didn't report any falls --

A.    -- twisting mechanism.

Q.    -- to you?

A.    No.

Q.    Okay.  And if, in fact, it is something else, then it would appear that it was something that occurred sometime in -- before 2012, because it showed up on those previous MRIs that he had before this accident in August of 2015?

A.    Right.  And -- like I said earlier, I don't think it's trauma related, and I -- I still feel that way, unless the new scan shows something totally unexpected.

Q.    And you indicated that a -- you diagnose him with a kind of soft-tissue injury at the chronic stage?

A.    Yes.

Following his first deposition, Dr. Blanda saw Tezeno on October 10, 2017. Tezeno rated his pain as eight out of ten. Dr. Blanda ordered an MRI with contrast to evaluate Tezeno's S3 vertebral area.

Tezeno had an MRI with contrast on October 18, 2017. Along with findings of discs bulging at L4-5 and L5-S1, the impression of the radiologist, Dr. Ballanco, relative to Tezeno's S3 vertebral area was:

> Abnormal signal with some enhancement within the S3 vertebral body without expansion but with suggestion of mild posterior cortical disruption. Findings are most suspicious for fracture. Osteomyelitis can also [make] this appearance, however, is thought to be less likely given the lack of adjacent soft tissue findings. Neoplastic disease is thought to be much less likely. CT[6] may be of value for confirmation if this diagnosis [is] in doubt.

At his follow-up with Dr. Blanda on October 19, 2017, Tezeno rated his pain as nine out of ten. Although a CT scan was recommended, Dr. Blanda performed X-rays. His notes reflect: "X-rays today of sacrum are done. I think I do see a faint fracture line present at the area that is suspicious on MRI." Subsequently, Dr. Blanda recommended a consultation with Dr. Staires regarding a caudal epidural steroid injection (CESI).

Tezeno saw Dr. Blanda on December 12, 2017, reporting his pain rating as seven out of ten. Since Tezeno's CESI was not approved, Dr. Blanda continued prescribing medications.

On February 6, 2018, Dr. Staires administered to Tezeno a fluoroscopically guided CESI. At his follow-up appointment with Dr. Blanda on February 20, 2018, Tezeno rated his pain as four out of ten and six out of ten. Dr. Blanda's records reflect Tezeno reported the CESI "helped better than 50%."

---

[6] On November 13, 2012, Dr. Willett, likewise, recommended a CT scan of Tezeno's S3 vertebral area.

At his follow-up appointment on March 22, 2018, however, Tezeno reported his pain returned two weeks after he received the CESI. He rated his pain as seven out of ten.

At his second deposition on April 20, 2018, Dr. Blanda testified that following his first deposition in September 2017, he examined Tezeno on October 10, 2017. Because Tezeno's symptoms remained the same and because the radiology report indicated the MRI on September 26, 2017 "was a little suspicious for a fracture down in that sacral lesion," he ordered an MRI with contrast. When asked about his conclusion that Tezeno did, in fact, have a fractured sacrum, Dr. Blanda explained:

> Yeah. I did an [X]-ray, and I focused on it. And the [X]-ray doesn't show things nearly as good as the MRI. But I thought there might have been a faint fracture line that was in the area of suspicion on the MRI. But the MRI is the most important thing.

Q. And on page two of that October 19th visit -- on the physical exam portion of it, you note that Mr. Tezeno's pain is worse with sitting and lying down. Is that consistent with the sacral fracture?

A. Yes, it could be. Sure. As you mentioned before, it's right by the tailbone. You've probably had or heard or talked to people that have had incidences where they have tailbone pain, and it's where you sit -- or laying on it -- all that could aggravate it.

Q. Okay. And given the fact that you treated Mr. Tezeno -- I believe in your prior deposition, we went over it. You've been treating him prior to the motor vehicle accident in August of 2015?

A. Yes.

Q. Given his change in complaints and the finding of the sacrum fracture, do you -- are you of the opinion that the sacrum fracture is trauma related?

A. I think it is. I mean, there's no other way to explain it. He didn't relate any other injury since then. So I suppose the mechanism was that he bounced or came down hard on his tailbone and that's what caused the injury.

Q. Okay. And you relate it to the trauma from the August 3rd, 2015, accident?

A. Like I said, that's the only trauma he described to me. I mean, if there's something else, certainly it's worth reconsidering.

Q. Sure. But I'll ask you just to assume that's the only thing that he described to you and the only thing that he has, then you would relate it to the motor vehicle accident?

A. Yes, sir.

Concerning Tezeno's need for further treatment, Dr. Blanda indicated, "The plan is just to treat the symptoms." This exchange followed when Dr. Blanda was asked, "Your plan is to continue doing what you had done in the past?"

A. Yes.

Q. Just treat with injections and medication?

A. Yes. And then --

Q. And some therapy?

A. -- this should heal. I mean, it's probably slower healing than most sacral fractures because of the lesion there. But it may already have come to the -- what's called maximum medical improvement time, where the healing is pretty good. The radiologist just read it as a faint, small defect. So I don't expect that this is going to be a permanent problem.

When Dr. Blanda was cross-examined by defense counsel about his opinion that Tezeno had a fractured sacrum, the following exchange ensued:

Q. Dr. Blanda, in regards to the fracture, how long does it generally take a fracture to heal?

A. Normally in that area, I would say about a year.

Q. Okay. The MRI and all that that shows the -- the one that you -- well, let me ask you this. The one that the radiologist says is highly suspicious of a fracture is over two years from the accident?

A. Right.

Q. Isn't it kind of unusual that the facture would still be there two years later?

A. Well, under normal circumstances, you're right. But, like I said, this is a cystic area, it's a thin wall, the pathologic fracture, so

19

that fracture line may be visible for longer that the regular healthy bone.

Q. But if there was nonunion or something, wouldn't that be present if he had some nonunion or fibrosis union? Wouldn't the changes be present on the MRI?

A. The earlier MRI or the recent?

Q. Well, the ones -- you know, usually within -- you know, you had said within a year --

A. Yeah.

Q. -- the fracture should be gone and it wouldn't show up as a fracture on an MRI.

A. Well --

Q. And we are now over two years.

A. Yeah.

Q. And you're indicating that it appears that there's a fracture there. If it's not healing correctly, shouldn't there be some other changes on the MRI that shows, you know, the nonunion or the fibrosis union on the MRI?

A. Not really. I mean, I think it's healing. It's probably almost healed from that point of view. But you've got to remember that this was the first MRI that was done with the dye, with contrast. So it's showing things that the other MRIs probably couldn't show.

Q. The -- given that we have two MRIs that were done before this accident and he now has three MRIs that were done subsequent to this accident, and I think you had previously indicated that looking -- well, two of them were done after the accident, before our other deposition we took.

A. Right.

Q. And I think you had indicated that the lesion in the sacrum could be causing the symptoms, but it was not a trauma thing. It was a developmental problem?

A. Right.

Q. And you were comparing the MRIs that were before his accident to those that were after this 2015 accident, and I think you indicated that it was not a trauma thing.

20

A. Yeah. Again, that was before this last MRI with contrast in it because the other MRIs did not --

Q. Insofar as the individual, who would be the best one to -- as far as looking at the MRIs and comparing the MRIs before and the MRIs after, to make an opinion as to whether or not whatever is there today was also there since 2012?

A. Well, certainly the radiologist. But you've got to remember, it's comparing apples to oranges because the previous MRIs were noncontrasted. And you can't compare that with a contrast MRI, because the contrast MRI is a little bit better test in looking for a fracture or some sort of active process going on because it's related to the blood flow. And the blood flow picks up the dye, and that's why the other radiologist had recommended it.

Q. But you don't think it would be better -- you would have some kind of evidence of an MRI of maybe some edema or hemorrhage or some other traumatic changes in the MRI in the area if it was trauma related?

A. Well, you've got to remember, too, that this is a very small fracture line. It's not like a complete through-and-through break or anything of that sort. So -- but, yeah, there would probably be some, but it probably wouldn't show without the dye.

Q. Okay. Do you know whether or not that is -- that shows even the one that was done with the dye -- the edema --

A. He said there's --

Q. -- or hemorrhaging?

A. No. He said it's not any -- we're over two years. So all that edema and soft tissue swelling would have resorbed by this time.

Q. But -- okay. Would you think that having a neuroradiologist review the MRIs before the accident, the x-rays before the accident, and the MRIs done subsequent to the accident -- including all three of them and the x-rays that you did after the accident -- would be able to give an opinion as to whether or not what is there today has been there at the S3 level, whether it's a fracture or whatever, during that entire period of time.

A. I wouldn't object to that. But, I mean, we're talking about a very minor problem here.

Q. Okay.

A. I don't know whether it's worth, you know, whatever you --

Q. Okay. So what you're saying is that even if there's a fracture, the fracture is not that serious a fracture --

A. Right.

Q. -- to begin with?

A. No. It's --

Q. And it was a very minor incident. And this individual was seeing you on a regular basis for pain medication, maybe injections, and all even before this accident.

A. Right.

Q. And you're doing the same thing for him now?

A. Yeah. That's what I had alluded to earlier, that, you know, he was coming here for chronic pain even before this happened. This happens. He gets a -- you know, what I think explained the increase in pain. But it's healing or going to heal, and he's going to probably be back where -- his pain now is going to be a blend of pre and post-injury problems.

Q. So do you feel that, you know, if it has not already -- the fracture part has not healed, that it's -- that part of it is going to be you know, probably shortly resolve itself?

A. Yeah. I think so. Like I said, the fracture's small. It's hardly -- probably not even visible on a plain x-ray, and it took the MRI with a contrast to see it. And -- but it's there. And it would probably explain the increase in pain, particularly in that area.

Relating to his future treatment plan, Dr. Blanda reaffirmed that Tezeno's injury was not permanent. Defense counsel asked, "And the treatment that he has been getting, even before the accident and after the accident, will be pretty consistent?" Dr. Blanda further conceded:

Yes, sir.

Q. So whatever he's doing now is related also to his pre-accident treatment that you were giving him?

A. Yeah. I think partially, sure. I mean, you know, those symptoms didn't go away.

22

Following his second deposition, Dr. Blanda saw Tezeno on June 21, 2018. Tezeno rated his pain as seven out of ten. Dr. Blanda recommended another MRI with contrast again to evaluate Tezeno's S3 vertebral area.

Tezeno had an MRI with contrast on June 27, 2018. The findings of the radiologist, Dr. Richard Lastrapes, indicated:

> There again is abnormal marrow signal involving the S3 segment of the sacrum. This is low signal on T1 and increased signal on T2. This could represent a[n] incidental hemangioma. Following contrast administration there is slight enhancement within this area. No other focal areas of abnormal marrow signal are noted. In retrospect this is noted on the old MRI of the lumbar spine November 13, 2012 suggesting a benign process. The SI joints appear symmetric without diastases. No focal marrow signal abnormalities are otherwise noted involving the SI joints.

Tezeno saw Dr. Blanda on July 10, 2018. Tezeno rated his pain as seven out of ten. Dr. Blanda's notes indicate:

> The patient is followed for low back pain. He had a sacral MRI that was reported as a benign process. I think it could also represent a healed fracture as had been reported on a prior MRI. I don't see a surgical lesion. He says his medications help. The caudal ESI helped a lot and may need to be repeated.

Dr. Blanda continued the prescription medications Norco, Flexeril, and Ibuprofen, and added Neurontin to Tezeno's medication regime.

Tezeno saw Dr. Blanda on August 9, 2018. He rated his pain as seven out of ten. This is the last appointment recorded in evidence before trial in this matter on September 26, 2018.

The defense presented Dr. Wojak as an expert in field of diagnostic radiology. Prior to her deposition on September 4, 2018, Dr. Wojak reviewed the films of Tezeno's MRIs and X-rays taken both before and after the accident, with the exception of the seventh and final MRI performed on June 28, 2018.

Dr. Wojak disputed Dr. Blanda's belief that Tezeno had a sacral fracture. She opined there was no radiographic evidence Tezeno had a fracture in the sacral lesion.

When asked what conclusions she drew from her evaluation of Tezeno's MRIs, Dr. Wojak replied, "All of the MRIs demonstrated a focus of abnormal signal in the sacrum at approximately the S3 level, . . . it never changed. It was there since the beginning, since the first examination." She denied there was any indication of trauma, and opined it was "a benign lesion . . . what we call an indolent lesion. Likely it's a hemangioma[.]" Under cross-examination, Dr. Wojak expounded, "[I]f you look at a bone with a hemangioma, the bone structure, it's thinned out but it's still there so it's not a tumor that's eating away things or expanding. It's just a development abnormality."

Dr. Wojak also opined there was no indication of a healed sacral fracture on either the pre-accident or post-accident MRIs. When asked what the MRIs would show if a fracture had existed, Dr. Wojak explained:

> Immediately after the fracture you would see swelling in the soft tissue, soft tissue edema surrounding the bone and possibly a little bit of blood. You would see edema swelling in the bone marrow itself, water in the bone matter itself surrounding the area. And then with time you would see it evolve as the swelling the[n] goes down both in the bone marrow and outside of the bone marrow and either heals, you get a bony union and you may -- you'[ll] probably just see a little faint line but really it'll -- it heals solid or if it doesn't you get a fibrous union, then you'll persist in seeing a fracture line and seeing some soft tissue signal abnormality. But there's nothing to suggest either an acute or a chronic fracture in any of the studies.

Addressing Tezeno's first MRI with contrast performed on October 18, 2017, Dr. Wojak testified she did not see anything that was suspicious for a fracture. Referring to Dr. Ballanco's notation that the findings were "suspicious for a fracture," Dr. Wojak was asked, "[I]f there would have been any kind of fracture that would have shown up on October 18th, 2017[,] would it be related to a[n] accident that occurred over two (2) years from that date?" Dr. Wojak opined:

> It shouldn't be. No, but here's the thing, they don't -- but it's not suspicious for a fracture because it hasn't changed in five (5) years. It hasn't -- a fracture, it heals or it doesn't heal and if it

doesn't heal, then it's very obvious on an MRI. It's obvious on a plane film. You see chronic bony changes. The bone gets sclerotic. It gets dense across the fracture lines. You see this soft tissue and that enhances generally quite rightly with contrast so -- and if you had a fracture two (2) [years] earlier and it healed, it shouldn't still be looking the same. It's shouldn't still have marrow edema. That report to me says that the person that read it didn't look at the old films.

Q.    Okay. Well, it does say that they compared it with the September 26, 2017[,] which was then the month before.

A.    Correct. So, yeah. I mean, but they didn't go back and look at the historical films.

Specifically rebutting Dr. Blanda's perception of a fracture on X-rays of Tezeno's sacral area, Dr. Wojak opined:

> You should see changes in the bone. If there's a chronic non-union, so just from the bone sliding and rubbing on each other, you'll get -- you get -- the bone gets polished. It gets eburnated. It gets sclerotic so you -- and you kind of get these rounded margins. It doesn't look like a fresh fracture anymore. And you have granulation tissue, fibrous tissue that's trying to hold it together and so you'll see this soft tissue surrounding the fracture and that soft tissue generally enhances pretty significantly. It's one of the things that they were looking for. Any other fracture that would have healed, it if [sic] had -- you know, if you had a fracture when it's acute, as I said before, you have edema. You have water in the bone marrow, swelling in the bone marrow but that goes away when the bone heals so it should not still be there two (2) years later.

Based on her review of the MRIs performed between 2012 and 2017—two pre-accident and four post-accident—Dr. Wojak found "no radiographic evidence of any change" in Tezeno's sacral area.

The defense also presented Dr. Romero, an orthopedic spine surgeon. Prior to his September 12, 2018 deposition, he performed an independent medical examination of Tezeno on July 11, 2018. Dr. Romero explained that prior to this exam, he reviewed all of Tezeno's medical records dating back to 2011.[7] During

---

[7] Dr. Romero's review included Dr. Fontenot's medical records; Dr. Blanda's medical records; Dr. Staires's medical records; a report from Dr. Wojak; the two depositions of Dr. Blanda;

this exam, he reviewed these medical records with Tezeno to allow him to clarify or expand upon Dr. Romero's appreciation of Tezeno's medical history.

According to Dr. Romero, during his examination, Tezeno "complained of low back pain. He also described left leg pain over his medial thigh and foot which appeared to be most consistent with an L3 distribution." Dr. Romero, however, testified Tezeno denied pain over his sacral area during the physical examination. His examination revealed Tezeno had a moderate decrease in motion in his lumbar spine, a normal gait, normal reflexes, and "his straight leg raise produced back pain but no radicular leg symptoms which would make it negative straight leg raise. So overall his exam was consistent with subjective complaints but decreased range of motion and pain."

Relating to his review of Tezeno's MRIs and X-rays, Dr. Romero testified he found no evidence Tezeno had a sacral fracture. Dr. Romero was of the opinion that Tezeno's MRIs and X-rays "taken before and after the accident showed no change." He explained:

> So the first MRI study [Tezeno] had after the motor vehicle collision was on October 7th, 2015. I did review the images. It showed very mild disc bulging at L4-5 and L5-S1. It also showed what appeared to be a lesion in the S3 vertebral body which I thought was consistent with the hemangioma. But really no evidence of stenosis or nerve root impingement or acute pathology on this MRI.

> Q.    Did it look like it had any type of fracture at that S3 level?

> A.    No. So there was -- you know, we do different images, different types of spins, and you have what's called T1, T2 images. You have stir images. So you look at the character of a lesion on the different imaging studies and while some of the components of this lesion could be consistent with the fracture, it was also very consistent with the hemangioma which we often see as an incidental finding in the spine quite often. I went back and looked at the MRIs from before the accident, it was also there.

the MRI films and reports taken between 2012 and 2017; and X-rays taken by Dr. Blanda of Tezeno's sacrum and pelvis of October 18, 2012, November 24, 2015, and October 19, 2017.

Dr. Romero defined a hemangioma as a benign blood tumor.

Based upon his review of Tezeno's extensive medical history, along with his own physical examination, Dr. Romero disagreed with Dr. Blanda's view that Tezeno had a sacral fracture. Dr. Romero explained:

> [I]f a fracture had been present since 2012, it would have likely healed now, that, and the physical exam. So imaging studies don't often stand alone. You have to have a person to examine and correlate that clinically. He had no pain over the S3 region so if he still had a sacrum fracture there, you would expect him to have pain. In addition, if he had a fracture back in 2012 you would expect[] it would likely have healed by now and you would no longer see that -- those changes on T1 and T2 images.

When asked whether the MRI with contrast performed on October 18, 2017, presented a clearer picture of a fracture or a healed fracture, Dr. Romero declared:

> [T]he contrast really doesn't add to a fracture, it more adds to a metabolic process so if you have like a tumor or something that's active like a malignant tumor or something like that, you might be able -- or an infectious process. I didn't think that the contrast added much to the picture and it was still consistent with the hemangioma.

Thus, Dr. Romero opined, "The only thing you can relate to the accident is [Tezeno's] subjective increase in symptoms but it's not really backed up by either the records or the imaging studies. It's not like when he saw Dr. Blanda after the accident that he changed his treatment."

At his deposition, Dr. Romero was presented with the report from Tezeno's MRI with contrast performed on June 27, 2018.[8] Dr. Romero observed the radiologist, Dr. Lastrapes, reported an "abnormal marrow signal" in the S3 vertebral area which "has been documented on an old MRI of the lumbar spine in 2012 likely representing a benign process such as an incidental hemangioma." Dr. Romero

---

[8] Defense counsel indicated Tezeno's seventh and final MRI performed on June 27, 2018, was not known to him at the time of Dr. Romero's examination of Tezeno on July 11, 2018.

noticed the radiologist compared Tezeno's first and last MRIs—2012 to 2018—and mentioned nothing about a fracture in Tezeno's S3 vertebral area.

At the bench trial of this matter on September 26, 2018, Tezeno called Officer Savoie to testify about the accident. At the time of the accident, Officer Savoie, now employed with Scott Police Department, worked as a patrolman with the Ville Platte Police Department. Officer Savoie responded to the accident scene and noted the damage to the rear end of Tezeno's truck as being minor to moderate. He testified Tezeno denied being injured in the accident.

Tezeno testified that immediately after the collision, he felt pain in his back. He insisted he told Officer Savoie he was hurt. Tezeno drove home and took pain medication which had been prescribed to him by Dr. Blanda, taking more than the dosage prescribed because of his increased pain.

Tezeno went to see Dr. Fontenot the next day because his medications did not provide him any relief. He was not prescribed any medication by Dr. Fontenot since he was already taking prescribed pain medication—hydrocodone (Norco), cyclobenzaprine (Flexeril), and Ibuprofen—from Dr. Blanda. He attended therapy with Timothy Fontenot, physical therapist, on August 4, 2015 and August 17, 2015, but he did not experience any relief from his therapy sessions.

Tezeno testified his accident in 2011 injured his lower back and right leg but prior to the accident at issue, his right leg pain had stopped, and his lower back pain had become manageable. He stated the accident on August 3, 2015 caused his lower back pain to become unbearable and caused his right leg pain to recur. He also testified that several months after the accident, he began to experience pain in his left leg and he temporarily felt testicular pain. Tezeno testified that since the accident, his back pain has become unbearable, and he cannot sit for prolonged

28

periods. He rated his pre-accident pain as three out of ten and his post-accident pain as ten out of ten.

Tezeno claimed Dr. Romero examined him for only twenty minutes. He performed certain physical tasks for Dr. Romero, but claimed Dr. Romero never physically examined him nor did he ask Tezeno to identify where he felt pain. When asked if he knew "why Dr. Romero would say that you denied having sacrum pain?" Tezeno replied, "He never asked me."

Tezeno attributed his inability to do certain tasks to the accident. Before the accident, he employed his aunt to clean his house three or four times a year. Since the accident, he needs his aunt to clean his house once a week. He pays $80.00 a week for the assistance of a housekeeper. His pain prevents him from playing softball with his daughters, riding four-wheelers in trail rides with his children, and mowing his own grass. Because of his limitations, Tezeno feels constant anger, but he testified he does believe psychological treatment recommended by Dr. Savant would help.

Under cross-examination, Tezeno reiterated he told Officer Savoie he had back pain immediately after the accident but claimed Officer Savoie simply did not write it down. Tezeno admitted to being involved in an accident in 2011, and to being under Dr. Blanda's care for injuries since that accident and at the time of the subject accident. When asked if the medication he was prescribed before the accident changed or remained the same after the accident, Tezeno confirmed the medication remained the same, but he stated, "we also discussed upgrading my medicine also because of the pain." Tezeno could not recall whether Dr. Blanda recommended surgery after his accident in 2011. He acknowledged seeing Dr. Blanda and receiving prescription medications every three months.

29

When confronted with variations between his trial testimony and his deposition testimony from January 10, 2017, specifically regarding whether the accident caused him pain on his right or left side, Tezeno claimed he confuses his left and right and stated that defense counsel's deposition questions confused him.

*Reasons for Judgment*

After taking the matter under advisement, the trial court issued written Reasons for Judgment, ruling as follows on causation:

> The testimony of police officer Mr. Cody Savant was heard. Mr. Savant noted that at the time of the accident no injuries were reported and there was damage to the back end of the plaintiff's vehicle.
>
> The testimony of Mr. Curtis Tezeno was heard. He stated that the impact shoved his truck forward, the tailgate of his vehicle was beat up, and the bumper was damaged. Mr. Tezeno had a preexisting back injury and had been treating with Dr. Louis Blanda since 2011. He testified that he experienced an immediate change in his condition after the August accident. Mr. Tezeno testified that after the August 3, 2015 accident he continued his treatment with Dr. Blanda. Mr. Tezeno testified that he was offered stronger pain meds but he declined because he didn't want to become addicted and that his pain has been consistently worse since the accident of August 3, 2015. He also testified that prior to the August 3, 2015 accident the pain was manageable and the [r]ight leg pain was better. After the accident he hurts constantly in his back and has had sacrum pain since the 2015 accident. Mr. Tezeno stated that he had no other accidents since August of 2015. His testimony further revealed that although he had a housekeeper before the accident he needs her more now since the accident. He also testified that this accident has changed his interactions with his small children because that interaction has become limited because of the accident. He testified that he is no longer able to ride four-wheelers with his children, he does not do yard work anymore, and that since this accident, he is angry all the time. He testified before the accident his pain level was a three and since the accident his pain level is a ten. He also testified that he has not worked since the accident although he was limited prior to the accident to part[-]time work. His testimony was largely un-rebutted although Mr. Tezeno was cross-examined concerning inconsistent statements he gave in his deposition prior to the trial and his testimony at trial. . . .[9] The issues turn on [whether] this was an aggravation of a preexisting condition and the extent to which that condition was aggravated. Dr. Blanda[,] the [plaintiff's] long time treating physician[,] in his September 28, 2017

---

[9] The trial court's itemization of evidence in the record is omitted since the evidence introduced by the parties is previously listed.

30

deposition found that the August 15 accident aggravated Mr. Tezeno's preexisting condition. His pain systems changed and he continued to rate his pain levels higher. Dr. Blanda also found that that [sic] it was feasible that his old injury would have gradually gotten better absent the new injury[.] Also[,] Dr. Blanda diagnosed the plaintiff with a sacral fracture, he stated[,] "I think this pretty much explains why the pain increased with his second injury or new injury."

Dr. Joan Wojak was hired to perform a medical examination of the plaintiff by the defendant for litigation purposes.

The [d]eposition of Dr. Neil Romero was introduced. Dr. Romero testified to essentially the same thing; that defendant contacted him in connection with performing an evaluation. Both Dr. Wojak and Dr. Romero had differing medical opinions on causation and diagnosis than Dr. Blanda.

In a negligence action[,] the plaintiff bears the burden of proving fault, causation, and damages. One injured through the fault of another is entitled to full indemnification for damages caused thereby. A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. [*Wainright v. Fontenot*, 00-492, (La. 10/17/00), 774 So.2d 70]. The trial court is bound by the general rule that a treating physician's opinion is given more weight than that of a non-treating physician. Furthermore[,] a Specialist in a given field is given more weight than a general practitioner. [*Ellis v. Rapides Parish School Bd.*, 419 So.2d 990 (La.App. 3 Cir. 1982)]. Applying the law as cited above[,] this court finds that the August 2015 accident caused an aggravation of plaintiff's preexisting condition as well as a [s]acrum [f]racture.

(Footnotes omitted).

### *Standard of Review*

An appellate court should not disturb reasonable factual findings of the trial court in the absence of manifest error. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). In *Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987) (quoting *Arceneaux*, 365 So.2d at 1333), the supreme court put forward a two-part test for the appellate review of facts: "1) The appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and 2) The appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous)." The two-part test in *Mart* "dictates that a reviewing

31

court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. *Id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous." *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993) (citing *Mart*, 505 So.2d 1120). Even when a reviewing court feels "its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Stobart*, 617 So.2d at 882). However, a reviewing court may find manifest error in a finding purportedly based upon a credibility determination "where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story." *Stobart*, 617 So.2d at 882.

A plaintiff in a personal injury suit has the burden of proving by a preponderance of the evidence a causal relationship between the accident and the injuries of which the plaintiff complains. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615 (La. 2/20/95), 650 So.2d 757. The supreme court stated in *Maranto* that the plaintiff must prove "through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident." *Id.* at 759 (citing *Mart*, 505 So.2d 1120 (La.1987)). "[C]ausation is a factual finding which should not be reversed on appeal absent manifest error." *Detraz v. Lee*, 05-1263, p. 7 (La. 1/17/07), 950 So.2d 557, 561-62.

Another pertinent tort rule is the "eggshell plaintiff" principle: the well-settled rule that a defendant in a personal injury case takes his victim as he finds him and when a defendant's tortious conduct aggravates a pre-existing injury or condition, the defendant must compensate the victim for the full extent of the

aggravation. *Lasha v. Olin Corp.*, 625 So.2d 1002 (La.1993). "The 'eggshell plaintiff' is required to establish a causal link between the tortious conduct and the aggravation of his pre-existing condition." *Bienemann v. State Farm Mut. Auto. Ins. Co.*, 08-1045, p. 4 (La.App. 3 Cir. 2/4/09), 3 So.3d 621, 624.

"The test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by the accident." *Arabie v. CITGO Petroleum Corp.*, 10-2605, p. 19 (La. 3/13/12), 89 So.3d 307, 321 (citing *Lasha*, 625 So.2d 1002). Whether the accident caused the plaintiff's injuries and whether the plaintiff established a causal link between an aggravation of a preexisting condition are factual determinations reviewable under the manifest error standard of review. *See American Motorist Ins. Co. v. American Rent-All, Inc.*, 579 So.2d 429 (La.1991); *Touchard v. SLEMCO Elec. Found.*, 99-3577 (La. 10/17/00), 769 So.2d 1200. "Lawsuits cannot be decided on speculation or suspicion alone. There must be a reasonable amount of probative evidence to fortify a finding of fact." *Miller v. Miller*, 226 La. 273, 76 So.2d 3,4 (1954).

In this case, defendants argue the trial court erred in awarding $225,000.00 in general damages to Tezeno. They contend the evidence demonstrates Tezeno had a chronic back condition prior to the subject accident, as shown by Dr. Blanda's treatment following Tezeno's automobile accident in November 2011, which the subject accident aggravated only slightly, if at all. Defendants also argue the evidence does not support the trial court's determination the accident also caused a new injury, i.e., a fractured sacrum.

The primary evidence by Tezeno on the issue of whether the accident caused a new injury, i.e., a fractured sacrum, came from Dr. Blanda. The trial court concluded that Tezeno proved the accident worsened his preexisting back condition

33

and caused a sacral fracture, in part relying on the case of *Ellis v. Rapides Parish School Bd.*, 419 So.2d 990 (La.App. 3 Cir. 1982), for the proposition that the testimony of a treating physician should be given greater weight than the testimony of other physicians and, thus, decreed it was "bound by the general rule that a treating physician's opinion is given more weight than that of a non-treating physician."

The record reveals Tezeno regularly visited Dr. Blanda, obtaining prescription medications for treatment of his lower back and left leg symptoms resulting from his motor vehicle accident in 2011. Prior to the subject accident, Dr. Blanda even recommended surgery to alleviate Tezeno's lower back symptoms.

Following the subject accident, Tezeno reported increased back pain and a recurrence of right leg pain. Dr. Blanda continued to issue Tezeno the same prescription medications. In July 2016, Tezeno reported pain in his left leg; however, Dr. Blanda did not believe Tezeno's left leg problems were related to the accident since his left leg pain manifested more than a year afterward. In November 2016, Dr. Blanda ruled out Tezeno's need for surgery following a discogram which produced no objective signs of pain. During his first deposition in September 2017, Dr. Blanda characterized his diagnosis following Tezeno's discogram as "some type of soft-tissue injury, whether it's muscular or ligamentous."

In October 2017, Dr. Blanda formed a new diagnosis—a sacral fracture. A lesion in Tezeno's sacrum was first observed in 2012. After the subject accident, a sacral lesion was seen on two MRIs—October 7, 2015 and August 30, 2016—before the suggestion was made that Tezeno may have a sacral fracture.

Following Tezeno's MRI on September 26, 2017, Dr. Ballanco intimated Tezeno may have a sacral fracture. Dr. Ballanco did not identify a fracture; instead, it was his impression that an "[a]bnormal signal within the S3 segment which could reflect a fracture or other osseous lesion." In Tezeno's MRI with contrast on October

34

18, 2017, it was Dr. Ballanco's impression the lesion was "most suspicious for fracture."

According to Dr. Blanda, the fracture could be seen on X-rays he performed on October 19, 2017. Despite having testified he observed a sacral fracture via X-rays, Dr. Blanda also claimed "the fracture's small. It's hardly -- probably not even visible on a plain x-ray, and it took the MRI with a contrast to see it." He also characterized the fracture as "a minor problem." In his second deposition, more than two years after Tezeno's accident, Dr. Blanda testified sacral fractures normally heal in "about a year." When Dr. Blanda was reminded the subject accident had occurred two years prior, he stated he could only assume the accident caused the sacral fracture since no other accidents or traumas had been communicated to him by Tezeno.

According to the defendants' experts, Dr. Wojak and Dr. Romero, the medical evidence revealed Tezeno has a sacral lesion—a developmental defect which was not caused by trauma. Dr. Wojak testified Tezeno's sacral lesion appeared unchanged in each of his radiographic studies since 2012. Dr. Romero echoed Dr. Wojak's opinion relative to Tezeno's radiographic studies, and also testified Tezeno did not exhibit symptoms of having a sacral fracture.

After reviewing the entire record, we are unable to find that the trial court manifestly erred in finding that Tezeno proved by a preponderance of the evidence that the subject accident caused an aggravation of his preexisting back condition and that a causal relationship existed between the subject accident and a sacral fracture. Expert testimony is often contradictory and medical findings are often equivocal, particularly when differing studies show different minute fractures on x-rays and radiographic images. The trial court's decision to credit Dr. Blanda's opinion over defendants' experts cannot be manifestly erroneous when reasonable people could

conclude that the doctor had a sufficient basis for his opinions. The testimony of Dr. Blanda is reasonable and supported by the record. Accordingly, we find no merit in this assignment of error.

***Damages***

***General Damages***

Defendants complain that a general damage award of $225,000.00 was an abuse of discretion. We agree. Our law authorizes compensatory damages of special and general damages. La.Civ.Code art. 2315. The supreme court has

> defined general damages as 'those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money.'

*McGee v. A C and S, Inc.*, 05-1036, pp. 3-4 (La. 7/10/06), 933 So.2d 770, 774 (quoting *Duncan v. Kansas City S. R.R.*, 00-066, p. 13 (La. 10/30/00), 773 So.2d 670, 682).

When a quantum award is found to be an abuse of the lower court's discretion, it should be adjusted only to the extent of lowering or raising it to the highest or lowest point reasonably within the discretion of the court. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993); *Coco v. Winston Ind., Inc.*, 341 So.2d 332 (La.1976).

While we find no manifest error in the trial court's finding that Tezeno suffered a sacral fracture, Dr. Blanda specifically testified that the fracture was so "small" as to be "hardly . . . visible." It was, said Dr. Blanda, a temporary, "minor problem."

The record shows that the vast majority of the plaintiff's complaints pre-existed the subject accident. There has never been a surgical recommendation for Tezeno except for one that was made before this accident. In fact, Tezeno's

treatment subsequent to this accident was identical to the treatment before this accident for his chronic back condition. Any fair reading of this record establishes that the most Tezeno suffered as a result of this accident is a temporary aggravation of his pre-existing condition even considering the minor fracture discussed above.

In *Pannell v. Encompass Ins. Co.*, 06-1601 (La.App. 3 Cir. 5/2/07), 956 So.2d 152, we reduced a $195,000.00 bench verdict for aggravation of a pre-existing low back and new neck and shoulder injuries to $90,000, which was held to be the highest amount within the trial court's discretion. The plaintiff had a long history of back problems before the subject accident.

In *Deville v. Frey*, 10-1290 (La.App. 3 Cir. 5/4/11), 63 So.3d 435, *writ denied*, 11-1157 (La. 9/23/11), 69 So.3d 1158, the plaintiff was involved in two accidents approximately seventeen months apart. He subsequently underwent lumbar surgery, which he testified would not have been needed but for the second accident. His doctor, comparing before and after MRIs, testified that "there wasn't 'much difference' between them, but the disc herniation was 'somewhat'" enlarged. *Id.* at 440. We conducted a de novo review of the record because the jury had been told that the plaintiff received $450,000.00 to settle his claims from the first accident. This court found that he was entitled to $100,000.00 in general damages and $46,627.63 in medical specials.

Under the facts of this case, we find that $100,000.00 is the highest amount that could be awarded under these facts. Accordingly, we reduce the general damage award from $225,000.00 to $100,000.00.

*Special Damages*

Special damages are those which are determined with some degree of certainty and include past and future medical expenses. *Deligans v. Ace American Ins. Co.*, 11-1244 (La.App. 3 Cir. 3/7/12), 86 So.3d 109. When reviewing a trial

court's factual conclusions regarding special damages, we employ the manifest error standard of review. *Id.* Defendants, who have not challenged the trial court's award of past medical expenses, assert the trial court erred in awarding Tezeno $208,560.68 for future medical care primarily based on Dr. Savant's Life Care Plan for Tezeno. We agree.

At trial, Tezeno submitted a Life Care Plan prepared by Dr. Savant. At her deposition on August 29, 2018, Dr. Savant explained that the role of a life-care planner is to prepare medical treatment plans and set a value for future life care and medical needs for patients. In preparing Tezeno's plan, Dr. Savant interviewed and examined Tezeno for one hour on July 5, 2018, and she reviewed medical records.

Dr. Savant formulated a Life Care Plan, which set the value of $364,394.63 for Tezeno's future life care and medical needs. Dr. Savant re-formulated Tezeno's Life Care Plan after conferring with Dr. Blanda, lowering the value to $208,560.68. Tezeno's Life Care Plan included:

| | |
|---|---|
| Durable Medical Items | $169.70 |
| Evaluations | $7,172.00 |
| Future Medical Care | $43,764.93 |
| Home Care | $68,191.00 |
| Medications | $2,192.40 |
| Plan Administration | $59,500.00 |
| Surgical Intervention | $15,072.65 |
| Therapeutic Services | $12,498.00 |

Dr. Savant designated $169.70 for durable medical items. This amount would provide Tezeno with a transcutaneous electrical nerve stimulation (TENS) unit and a back brace, as recommended by Dr. Blanda.

Dr. Savant explained $7,172.00 for evaluations accounts for Tezeno to have initial consultations with physicians in the fields of chronic pain, family therapy, internal medicine, pain psychology, physical therapy, psychiatry, and rehabilitation services. When asked to explain what rehabilitation services entailed, since

$4,500.00 was attached to this consultation alone, Dr. Savant explained, "It's a vocational rehab assessment. It's a one-time visit with a voc specialist, and the pricing is from Conservant [Health Care] because they're the ones who provide that particular service." When asked the benefit of rehabilitation services, she explained:

> The benefit is that you an [sic] assess the patient for what their future functionality is occupationally or to do an avocational assessment, that is, to help them structure their days to include recreational activities, things that are going to keep them from sitting around and becoming deconditioned and thereby worsening their pain. So it's vocational as well as avocational rehab assessment.

Dr. Savant arrived at the valuation of $43,764.93 for Tezeno's future medical care. The plan included an EMG/NCV, two MRIs, a yearly comprehensive metabolic panel for five years, quarterly visits to a chronic pain specialist for life, and a yearly visit to an internist for life. Notably, Dr. Savant testified it was Dr. Blanda's decision to limit the plan for Tezeno's orthopedic care to five years.

Dr. Savant determined $2,192.00 was needed for five years of Tezeno's medications, including the prescription medications of Flexeril and Ibuprofen, and the over-the-counter medication Pepcid. Dr. Savant testified she omitted Norco from Tezeno's plan because Dr. Blanda planned to wean Tezeno off this medication.

The "home care" (housekeeping) valuation of $68,191.00 was based upon the Bureau of Labor and Statistics' value of $9.25 an hour for one visit per week for the rest of Tezeno's life.[10] She explained, "I do have a budget in here for housekeeping so that [Tezeno] doesn't unintentionally injure himself doing that."

Dr. Savant set $59,500.00 for plan administration. She explained the plan administration component as

> Having case management available to [Tezeno] so the plan is routinely updated as the resources are utilized, and also, if he is – let's say he's

---

[10] Dr. Savant's Life Care Plan was based upon Tezeno, who was forty, living to the age of seventy-six.

discharged from the doctor's care in the future. And he has a flare-up, the case manager can provide the treating doctors with clinical vignettes and coordinate appointments, follow-up appointments and things like that.

Dr. Savant designated $15,072.65 for surgical intervention. According to Dr. Savant, this involved Tezeno having CESIs once a year for five years, as recommended by Dr. Blanda.

Dr. Savant recommended $12,498.00 for therapeutic services. This calculation included psychiatry evaluations quarterly for two years, then psychiatry evaluations twice a year for three years, and weekly evaluations by a pain psychologist for one year.

Under cross-examination, Dr. Savant conceded she was not solicited to review Tezeno's medical records which predated the accident. She also denied knowing Dr. Blanda recommended Tezeno have back surgery prior to the accident. When defense counsel referred to deposition testimony from Dr. Blanda concerning whether Tezeno's injuries resulted from the accident, Dr. Savant stated:

> Well, first of all, you're getting into causation with me, and Dr. Blanda is going to testify, as far as I understand, to the causation aspect of the case. But as it relates to me with the life care plan, I have specifically addressed this with him over the phone in saying that the things we include in the plan are things that should be only related to the accident in question.

According to Dr. Savant, Tezeno's Life Care Plan was formulated based upon Dr. Blanda's view that Tezeno's accident on August 3, 2015, worsened his back injury and caused a sacral fracture.

Even though Dr. Savant readily admitted that Dr. Blanda truncated the medical treatment plan at five years, when questioned about costs that last a lifetime, Dr. Savant testified:

> A. …And then there were items that [Dr. Blanda] deferred to me because it was outside of his scope, and this is written in his handwritten

letter. Some of those I have truncated as well to five years based on our discussion. And some of them are ongoing.

Q. Which ones of the ones you have are lifetime as opposed to truncated to the five-year period of time?

A. Okay. Hold on a second. Let me look here. So since Dr. Blanda has given him five years of treatment from an orthopaedic standpoint, he will need a provider to take over management in the future of his pain. So we've got a chronic pain specialist to help with that. And chronic pain specialists tag team with the primary care doctors because sometimes the medications they use can cause adverse reactions and side effects and weight gain and exacerbation of their other comorbid medical problems. So you have an internal medicine and pain management, which Dr. Blanda agreed with, that are ongoing for lifetime. Everything else I have truncated to five years or less. For example, the psychological management of his chronic pain is one year only. And then some of the items are one time only or two times only.

Dr. Savant was questioned why Tezeno suddenly needed a life care plan administrator when he had "managed" his chronic back condition on his own for the previous eight years. The following colloquy occurred:

Q. He had been able to provide for himself for the last eight years without the necessity of having a life care plan?

A. He did not have a situation wherein a life care plan was a necessity.

Q. Well, what all of sudden eight years later makes it is necessity?

A. Well, he's had an exacerbation in his previous condition. His previous condition he had very, very minimal pain between two and three out of ten, and he was completely functional.

Dr. Savant was then presented with Dr. Blanda's deposition testimony indicating that his treatment plan would be identical to what it was pre- and post-accident.

Q. So [Dr. Blanda] feels that the aggravation of his preexisting condition will be temporary up to five years?

A. From an orthopaedic standpoint.

Q. From an orthopaedic. What other--if that portion of it resolves or goes back to his preaccident status, what is--what are you treating him for after the five years if it's not an orthopaedic problem?

41

A. Because there are nonsurgical, nonorthopaedic aspects to this when you have this kind of cumulative situation. The last accident aggravated things orthopaedically. The pain syndrome worsened over time, and there are other things that come with it like the psychological aspects. But I, too, have given him the five period.

However, life care plan management and housekeeping surpassed the five year period. Dr. Savant was never able to explain how the lifetime plan components could be distinguished as not attributed to the former accident except to say that she and Dr. Blanda had ongoing discussions about the issue.

Nothing in the record established that Tezeno suffered a permanent injury of any kind. Dr. Blanda found a minor and temporary injury. He agreed that the plaintiff had a pre-existing chronic back condition for which he had provided conservative treatment. Dr. Blanda provided identical treatment before and after the subject accident, and he recommended identical treatment in the future. Furthermore, he expressly declined to offer any treatment recommendations beyond five years finding that it would not be necessary. Despite no evidence of a permanent injury, and only minimal evidence of a temporary one, the trial court relied upon the "life care plan" to award a lifetime of future care to Tezeno that included excessive fees for consultations and other assorted services despite there being no proof that Tezeno would need these services.

As we have found no manifest error in Dr. Blanda's findings that the subject accident caused an aggravation of a pre-existing injury and a minimal injury of limited duration, we find that Dr. Blanda's recommendations regarding future medical care and needs credible. After thoroughly reviewing the itemized costs in the life care plan, we find that Dr. Savant had no factual basis for determining various awards other than that she was asked to by plaintiff's counsel. Nearly $60,000 to "administer" the "life care plan" she created for Tezeno, when his orthopedic symptoms will be resolved after, at most, five years is unsupported and defies reason.

42

The administerial requirements of Tezeno's care consists of making several appointments a year with Dr. Blanda, to attend those appointments, and to obtain the medications that the doctor prescribed. There was no evidence that he had ever had any trouble handling basic adulting tasks or would need a person to do these tasks for him. On the contrary, the record suggests that he had done so without issue or fail since 2012—a full three years before the subject accident even happened.

Accordingly, we find that the trial court was clearly wrong in awarding $208,560.68 in special damages. Tezeno's future medical treatment will be identical to what it has been in the past. Reviewing the life care plan award line-by-line we find the following awards are supported by the record and Dr. Blanda's testimony:

Durable Medical Items

| | |
|---|---|
| TENS UNIT | $110.00 |
| Lumbar Back Brace | $59.70 |

Evaluations

| | |
|---|---|
| Chronic Pain | $434.00 |
| Physical Therapy | $890.00 |
| Rehabilitation Service | $4,500.00 |

Future Medical Care

| | |
|---|---|
| Electromyography and Nerve Conduction Studies | $701.93 |
| Comprehensive Metabolic Panel and CBC | $555.00 |
| Magnetic Reasonance Imaging | $4,168.00 |

Medications

| | |
|---|---|
| Medication | $1,127.40 |

Surgical Intervention

| | |
|---|---|
| Lumbar/Sacral (Caudal) Epidural Steroid Injections | $15,072.65 |
| TOTAL: | $27,618.68 |

Accordingly, we reduce the award for special damages to $27,618.68.

# REVERSIONARY TRUST FOR FUTURE MEDICALS

The Louisiana Governmental Claims Act, La.R.S. 13:5101 through La.R.S. 13:5113, establishes procedural rules that apply to any suit in contract or for injury to person or property against the state, a state agency, or a political subdivision of the state. La.R.S. 13:5101; *Fecke v. Bd. of Supers. of La. State Univ.*, 15-1806, 15-1807 (La. 9/23/16), 217 So.3d 237, *modified on rehearing*, 15-1806, 15-1807 (La. 10/19/16), 218 So.3d 1.

Louisiana Revised Statutes 13:5106(B)(3) governs personal injury awards for future medical expenses entered against political subdivisions. It provides, in relevant part:

> (a) In any suit for personal injury against a political subdivision wherein the court, pursuant to judgment, determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that a reversionary trust be established for the benefit of the claimant and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument. The reversionary trust instrument shall provide that such medical care and related benefits be paid directly to the provider as they are incurred. Nothing in this Paragraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits shall be provided, but with the requirement of establishing a reversionary trust.

> (b) Any funds remaining in a reversionary trust that is created pursuant to Subparagraph (3)(a) of this Subsection shall revert to the political subdivision that established the trust, upon the death of the claimant or upon the termination of the trust as provided in the trust instrument. The trustee may obtain the services of an administrator to assist in the administration of the trust. All costs, fees, taxes, or other charges imposed on the funds in the trust shall be paid by the trust. The trust agreement may impose such other reasonable duties, powers, provisions, and dispute resolution clauses as may be deemed necessary or appropriate. Disputes as to the administration of the trust can be appealed to the district court. Nothing in this Paragraph shall preclude the political subdivision from establishing other alternative funding mechanisms for the exclusive benefit of the claimant. The terms and conditions of the reversionary trust instrument or other alternative funding mechanism, prior to its implementation, must be approved by the court. The parties to the case may present recommendations to the court for the terms and conditions of the trust instrument or other

funding mechanism to be included in the order. Upon request of either party, the court shall hold a contradictory hearing before granting a final order implementing the reversionary trust or the alternative funding mechanism.

According to La.R.S. 13:5106(D)(3), "medical care and related benefits" means "all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services." Additionally, La.R.S. 13:5106(D)(4) defines "reversionary trust" as:

> [A] trust established by a political subdivision for the exclusive benefit of the claimant to pay the medical care and related benefits as they accrue, including without limitation reasonable and necessary amounts for all diagnosis, cure, mitigation, or treatment of any disease or condition from which the injured person suffers as a result of the injuries, and the *sequelae* thereof, sustained by the claimant on the date the injury was sustained. The trustee shall have the same fiduciary duties as imposed upon a trustee by the Louisiana Trust Code. Nothing herein shall limit the rights of claimants to contract with respect to attorney fees and costs.

Acknowledging this case presents an issue that no court has decided, the defendants argue the trial court erred in ordering the deduction of the total amount of attorney fees from the award for future medical care before the award is placed into a reversionary trust pursuant to La.R.S. 13:5106(3)(a). They contend the supreme court's logic in *Fecke*, 217 So.3d 237, for "deciding that the deduction of attorney fees from the award for future medical care in [a Future Medical Care Fund (FMCF)] case under La.R.S. 13:5106(B)(3)(c)[11] should apply to reversionary trust[s]."

---

[11] Louisiana Revised Statutes 13:5106(B)(3)(c) provides:

> In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, all such medical care and related benefits incurred subsequent to judgment shall be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2. Medical care and related benefits shall be paid directly to the provider as they are incurred. Nothing in this Subparagraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits

Tezeno argues La.R.S. 13:5106(D)(4) authorizes the trial court to approve his contingent fee contract with his lawyer for reasonable attorney fees which may be deducted from the future medical care award before its deposit into a reversionary trust. He refers to the definition of "reversionary trust," which states, "Nothing herein shall limit the rights of claimants to contract with respect to attorney fees and costs." La.R.S. 13:5106(D)(4). Thus, Tezeno asserts the trial court rightly ordered deduction of contractual attorney fees from his future medicals award prior to placing these funds into a reversionary trust.

The plaintiff's personal injury suit in *Fecke* was against a state agency. Tezeno's suit is against a political subdivision. In *Fecke*, the plaintiff was awarded future medical care to be paid from the FMCF. Tezeno's award for future medical care is required to be deposited into a reversionary trust to "be paid directly to the provider as they are incurred." La.R.S. 13:5106(3)(a). The supreme court ruled the plaintiff in *Fecke* was not entitled to attorney fees and costs from the FMCF prior to its placement into the fund. The *Fecke* court reasoned:

> Louisiana [Revised Statutes] 13:5106(B)(3)(c) provides a claimant is entitled to "medical care and related benefits that may be incurred subsequent to judgment." As noted in our discussion of judicial interest, neither this statute nor the statutory definition of "medical care and related benefits" includes attorney's fees or costs. Moreover, in *Starr v. Dept. of Transp. & Development*, 46,226 (La. App. 2 Cir. 6/17/11), 70 So.3d 128, the Second Circuit Court of appeal concluded that attorney's fees are not "medical care and related expenses" that qualify for payment from the FMCF. *Id* at 25, 70 So.3d at 144.
>
> In addition, a search of the statutes and jurisprudence reveals no statute that authorizes payment of attorney's fees for future medicals prior to payment of the judgment into the FMCF. Louisiana [Revised Statutes] specifically provides for payment of costs in a personal injury suit against the state, but does not specifically provide for attorney's fees. Although [La.R.S. 13:5106(D)(3) refers to attorney's fees in the provision defining "reversionary trust," that "[n]othing herein shall limit the rights of claimants to contract with respect to attorney's fees

shall be provided but with the requirement that they shall be paid in accordance with this Subparagraph.

46

and costs," the Feckes' reliance on this provision is misplaced because it applies only to political subdivisions.

*Fecke*, 217 So.3d at 250-51 (footnote omitted).

While *Fecke* is informative, we do not find it wholly dispositive of the issue before this court. As such, we find there is no basis on which to rule the trial court erred in ordering that the amount owed by the defendants for Tezeno's future medical care shall, after deduction of attorney fees, be deposited into a reversionary trust. The trial court's judgment in this regard is affirmed.

## CONCLUSION

While we find no manifest error in the trial court's finding that the subject accident aggravated a pre-existing back injury and caused a minor sacral fracture, we find the trial court's general damage award to be an abuse of discretion and reduce it to $100,000.00. We find the trial court's award of special damages to be manifestly erroneous and reduce it to $27,618.68 for future medical care. We affirm the trial court's ruling relating to the distribution of attorney fees before placement in the reversionary trust for future medical expenses. Costs of this appeal are assessed equally to the parties, with appellate costs in the amount of $4,729.47 assessed to the City of Ville Platte, in accordance with La.R.S. 13:5112(A).

**AFFIRMED AS AMENDED.**

CURTIS TEZENO

VERSUS

DANIEL ROBERT YOUNG, ET AL.

**PERRY, Judge, concurs in part and dissents in part.**

I agree to a certain degree with the majority's reduction of the plaintiff's damage awards; yet, I write to explain the different analyses I used to arrive at nearly the same result. Unlike the majority, I find the trial court manifestly erred in finding Tezeno proved by a preponderance of the evidence that a causal relationship existed between the subject accident and a sacral fracture.

The main evidence on the issue of whether the subject accident caused a sacral fracture came from Dr. Blanda. At his first deposition two years after the subject accident, Dr. Blanda testified he considered Tezeno a surgical candidate until November 2016. His opinion changed after a discogram produced no objective signs of pain. Dr. Blanda also acknowledged that an MRI performed two months after the subject accident showed the lesion in Tezeno's sacrum was "not a trauma thing. It's a developmental problem with a blood vessel[.]" In September 2017, it was Dr. Blanda's diagnosis that Tezeno had either a muscular or ligamentous soft-tissue injury.

Dr. Blanda reversed course with regard to Tezeno's sacral issue based on an MRI performed in September 2017, two years after the subject accident. In medical records dated October 19, 2017, Dr. Blanda noted, "I think I do see a faint fracture line present" on X-rays of Tezeno's sacrum.

At his second deposition nearly three years after the subject accident, when asked about his conclusion that Tezeno had a sacral fracture and whether it was trauma related, Dr. Blanda answered, "I think it is. I mean, there's no other way to explain it. He didn't relate any other injury since then. So I suppose the mechanism was that he bounced or came down hard on his tailbone and that's what caused the injury." Under cross-examination, Dr. Blanda was asked, "how long does it generally take a fracture to heal?" He answered, "Normally, in that area, I would say about a year." When Dr. Blanda was reminded the subject accident had occurred nearly three years prior, he stated he could only assume the accident had caused the sacral fracture since no other accidents or traumas had been communicated to him by Tezeno.

Regardless of whose opinion is accepted—Dr. Blanda's opinion that Tezeno has a sacral fracture or the defense experts' opinions that Tezeno merely has a sacral lesion—it is the evidence relating the subject accident to a sacral fracture that I find unreasonably insufficient. While I fully appreciate the majority's reliance upon the jurisprudential rule that a treating physician's opinion is given more weight than that of a non-treating physician, this court has also held that this jurisprudential rule is "not [an] absolute, rigid[] rule to be mechanically applied in every case in which the medical evidence and testimony conflicts." *Danzey v. Evergreen Presbyterian Ministries*, 95-167, p. 11 (La.App. 3 Cir. 6/7/95), 657 So.2d 491, 497. This court elaborated:

> If this were the law, then every case in which a positive medical finding is made would result in victory for the claimant. The jurisprudential rules are not intended to operate in this manner. Instead, the rules are evidentiary in nature and create an evidentiary presumption which can be rebutted by the presentation of sufficient countervailing evidence of negative medical findings.

*Id.* Further, "[l]awsuits cannot be decided on speculation or suspicion alone. *Accord*, *Miller v. Miller*, 226 La. 273, 76 So.2d 3, 4 (1954)." *Mart v. Hill*, 505 So.2d 1120, 1127-28 (La.1987). "There must be a reasonable amount of probative evidence to fortify a finding of fact." *Miller*, 226 La. at 278. A treating physician's testimony should not carry greater weight if that opinion is based on speculations and assumptions.

Because I find clear error in the trial court's ruling relating to causation, I would review damages *de novo*, using principles set forth in *Mart*, 505 So.2d 1120. *See Thibodeaux v. Donnell*, 15-503 (La. 1/20/17), 219 So.3d 274 (the supreme court found an appellate court's alteration of a jury's causation finding to be "manifest error—or, in Professor Maraist's articulation, an error which 'interdicted the damage-determining process.' 1 La. Civ. L. Treatise, Civ.Pro. §14:14." *Thibodeaux*, 219 So.3d at 281. The supreme court expounded, "after a reviewing court finds manifest error in a trier of fact's finding, that court should perform a *de novo* damages review as articulated in *Mart*, unbound by the highest/lowest limitations of the *Coco* Rule.[1] *Mart*, 505 So.2d at 1128-29." *Thibodeaux*, 219 So.3d at 281).

With regard to the amount ultimately awarded for general damages, I agree with the majority. My *de novo* review establishes that $100,000.00 is a fair award for general damages in this case. In reaching this figure, I considered the accident caused an aggravation of a preexisting chronic back condition, producing past and future pain, mental anguish, and loss of enjoyment of life.

My position regarding special damages, however, differs from the majority— I would reduce this award even more. In view of my opinion that Tezeno failed to

---

[1] *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1976).

prove the subject accident caused a sacral fracture, I would further decrease his special damage award by $15,072.65, reflecting the exclusion of future lumbar/sacral (caudal) epidural steroid injections.

In all other respects, I agree with the majority.